EeeemaN, J.,
delivered the opinion of tlie Court.
Sarah Barker, then Sarah Mayfield, became entitled to about the sum of fifteen hundred dollars from the estate of her father, John Crockett, which seems to have been involved in litigation in the Chancery Court at Waverly, Humphreys county.
By a decree of said Court, at March Term, 1860, W. M. McAuley was appointed trustee for said Sarah, and the fund settled to her sole and separate use. McAuley was directed to give bond *427 and security for tbe faithful performance of tbe duties of bis trust; and by a singular direction of tbe Court, tbe decree says, tbat said trustee, “after giving tbe bond required before tbe Clerk and Master of tbe Chancery Court at Camden, in Benton county, shall receive tbe said sum of fifteen hundred dollars from L>. R. Owen,” tbe Clerk and Master of tbe Chancery Court at Waverly.
At April Term, 1861, on motion of McAuley, tbe trustee, it was ordered by tbe Chancery Court, at Waverly, tbat tbe “said trustee aforesaid make bis annual report to tbe Chancery Court at Camden, Benton county.”
It would seem from this, tbat tbe Chancellor intended to transfer tbe administration of tbe trust fund to tbe direction and control of tbe Chancery Court at Camden, as being most convenient probably to the parties; McAuley, tbe trustee, being a resident of Benton county.
We can see no need for, or advantage to be derived from this strange proceeding to either party in this case. Unless tbe court appointing ' tbe trustee, bad retained tbe cause in court, for tbe execution of tbe trust, and subject to further directions from time to time, in tbe management of tbe fund, as tbe result of such order, tbe appointment of tbe trustee, and bis acceptance of tbe trust, by giving bis bond, as required by tbe decree, ended tbe jurisdiction of tbe Chancery Court at Waverly over tbe matter, and be was not bound to make annual settlements with any court.
*428 The provision of the Code, section 1794, and sub-sections, in reference to property conveyed to trustees for payment of debts-, has no application to a trustee, appointed by the Chancery Court — a case like the one now before the Court.
The order of the Chancery Court at "Waverly, directing the trustee to make annual reports to the Chancery Court at Camden, was a nullity, so far as transferring the fund to that Court goes, and could upon no principle known to us, confer any jurisdiction on that Court. We may add, however, that such reports may be looked to, as any written, or even verbal admissions of the party may be, as evidence against the party making them of the fact stated in them.
The next question presented for our determination is, as to the competency of the testimony of Mrs. McAuley, the widow of the deceased trustee, who was introduced on the part of the administrators.
She proves in substance, that in 1862, 1863, or 1864, one Wm. McCane paid her husband money for Mrs. Barker, and that it was part of the trust fund; she also proves the kind of money — that it was in bills on the Bank of Tennessee, except about one hundred dollars in greenbacks — and the amount so paid, and that her husband handed the money to her, as soon as it was paid, and that it remained in her possession till his death, except about five hundred dollars — including the one hundred dollars in greenbacks — which was loaned out *429 to Perkins & Bartlett. She further proves that she handed this identical money to the defendants, as administrators of her husband.
This money, she says, was paid by McCane to. her husband, at his,' McAuley’s, house, and no person present, except herself, her husband, and said McCane. She executed a release of all her interest in the estate -of her husband, except her dower, so that the only question is, as to whether the wife, after death of the husband, is a competent witness to prove the facts deposed to, or is disqualified as a witness, On general principles, growing out of the matrimonial relation, and a' sound public policy, on this question.
The general question of the competency of the wife, after the death of her husband, to testify to facts occurring during the marriage, in a suit in which the representative of the husband is a party, is one, on which there has been much diversity of judicial opinion, and on which it is very difficult to say, on which side the weight of authority would be found, taking into consideration the number and standing of the courts that have held opposing views on the question.
Subject to certain exceptions, for the personal protection and security of the wife, the general rule is well settled, that neither the husband or the wife, is a competent witness for or against each other, in matters either civil or criminal:' 11 Hum., 566.
Mr. Starkie says: “There are also some in *430 stances where the law excludes particular evidence, not because in its own nature, it is suspicious or doubtful, but on the grounds of public policy, and because greater mischief and inconvenience would result from the reception than from the exclusion of such testimony. On this account, it is a general rule, that the husband and wife cannot give evidence to affect each other, either civilly or criminally. For to admit such evidence, would occasion domestic discord; it would compel a violation of that confidence which ought, from the nature of the relation, be regarded as sacred, and would be arming each of the parties with the means of offense, which might be used for very dangerous purposes:” See Sharswood’s Starkie on Ev., top p. 36.
The question of the competency of the wife to testify as to matters occurring, and coming to her knowledge during the existence of the matrimonial relation, where the interest of the husband or his estate was to be affected by the result of the suit, or was in controversy after the dissolution of the marriage, by death in the one case, and by divorce in the other, has been adjudicated by this Court, in two cases at least.
In the first case, Brewer v. Ferguson, 11 Hum., 565, the case was an issue of devisavit vel non, on the will of Brewer. The case turned on the state of the testator’s mind, with respect to his capacity to make the will in question. The former wife of Brewer was introduced by the party attacking the will, to show his incapacity, by proof of Ms *431 “conduct and conversations” during tbe existence of tbe marriage. Sbe was beld incompetent — not so much on tbe ground of tbe character of tbe facts proposed to be proven by her, as on tbe broad ground of public policy. Judge Totten,- delivering tbe opinion of tbe Court, says: “¥e are not disposed to follow tbe cases referred to by counsel, in which tbe rule of tbe common law, founded on public interest and policy has been relaxed or qualified, as, where it may seem to tbe Court that tbe fact proposed to be proved is not of a confidential nature, or where tbe marital relation no longer exists, and tbe witness is adduced to prove facts or admissions that occurred during tbe marriage. "We do not think that either of these exceptions to tbe rule can be maintained, either on principle or authority:” 11 Hum., 567.
Tbe other case was an action of trespass brought by Mitchell against Kimbrough for a violent assault and battery committed by Kimbrough upon him. Tbe wife of Mitchell bad been divorced before tbe trial, and was offered by tbe defendant to , “prove bow tbe difficulty occurred between tbe parties,” and tbe ill-usage of tbe husband to her, which bad led to tbe difficulty. Sbe was held incompetent. Judge McKinney, in delivering tbe opinion of tbe Court, says: “Tbe main object proposed in examination of tbe former wife, was to show tbe abuse inflicted on her by her former husband, and to justify or at least palliate tbe battery, in consequence of tbe alleged wrongs done her. If this *432 were allowable there would be no stopping place, and in all cases, whether affecting the property, reputation, or even the life of the former husband, she might be a witness:” 1 Head, 542.
The Court of Appeals of New York have followed and approved the common law rule, and the general current of English authorities, in an able opinion by Johnson, J., in case of Hasbrouck v. Handevort and Haywood, 9 N. Y., 157, in which a review of the authorities will be found, together with the principles on which the exclusion of the wife rests, given with great clearness, fullness and force.
"We will not undertake to go through the numerous cases cited by defendants’ counsel, in support of an opposite view of the question. We only propose now to look at the question presented in this ease, and see whether the Chancellor properly excluded the testimony, under the decisions above cited.
The facts proposed to be proven were facts and occurrences between the husband and a third party, on which a liability was created, or avoided, by the husband himself, if he had lived. The. wife, by reason of her position as wife, was present, and obtained knowledge of them by reason, of that relation. If she could testify of' facts favorable to her husband, or that would show his conduct to be free from blame, then she might equally be called to testify as to those things, that might fix blame, and fasten responsibility upon him. If this *433 coulcl be permitted, it would tend to destroy that bond of mutual confidence 'and unquestioning trust that is essential to the peace and happiness of this most sacred of all domestic relations. No man would be willing to have his wife called on in a court of justice to detail the facts of which she gains a knowledge, by reason of the fact that she is the companion of his privacy, and has unlimited freedom of access to all the occurrences that transpire in his home and around the fireside; and the reasons for this rule are as strong, or nearly so,, after the death of the husband as before.
"We, therefore, conclude, that on high grounds of public policy, that demand to be upheld, and maintained, as subserving the general' social interest of the community, the wife was incompetent, and her testimony properly excluded by his Honor the Chancellor.
The next question presented grows out of a decree made by the Chancery Court at Camden, at August Term, 1866. It appears in the record, entitled W. M. McAuley, Trustee for Sarah Mayfield, and recites that this cause came on to be heard, etc., and it appearing to the satisfaction of the court that W. M. McAuley was appointed trustee for Sarah Mayfield, since intermarried with Z. Barker, and that said McAiiley was dead, and defendants, in the present case, Boberson and James McAuley, were his administrators, and that one thousand and ten dollars in Tennessee money, and certain notes are now in their hands belonging to said *434 Sarah Barker, and that she is in a destitute condition, and ought to have the benefit of part of said funds for present relief. The court thereupon decreed that John T. "Winfrey be appointed trustee for said Sarah Barker, requiring him to give bond, etc., after which he was authorized to make settlement with said administrators, and take into possession the said sum of one thousand and ten dollars, and the notes referred to, in the hands of the administrators, and to dispose of the money to the best advantage, and collect the notes, and furnish • the said Sarah with all necessary sums for her support, until next term of the court, and then make his report to said, court. Winfrey entered into bond, as required, on 4th day of September.
On the 29th of August, two days after the above decree, the administrators made a report to the court, in which they state, in substance, that their intestate had received the one thousand and ten dollars, and go on to say it had been useless, as it could not be safely loaned out, and in a word, to make a case, exonerating the trustee from all liability.
On 8th of September, 1866, Winfrey, the trustee so appointed, makes his report, and shows that he had received the money and notes from the administrators. The Clerk and Master of the court submitted a report, which was excepted to, and be was ordered to make another, and did so, June 22d, 1867, in which he stated an account of the receipts and disbursements of the trustee, in which he *435 allows him or his administrators, credits for the money paid to "Winfrey, and the notes handed over to him — in a word, his accounts were passed upon and settled.
To this report of settlement, there were a number of exceptions filed, that certainly are well taken, on which, as far as we can see, no action was ever had by the Chancellor.
At about this stage of the proceedings, the present bill • was filed, seeking an account of the trust fund, against the administrators, and sureties on the trustee’s bond. James McAuley and Roberson, the administrators, file their answers jointly, in which they adrnit the receipt of the • original fund by their intestate; that he gave .bond before the Clerk and Master of the Chancery Court at Camden; that he was ordered to make, his report to the Chancery Court at that place, which he did, until prevented 'by the war. They deny that the sum claimed by complainant in her bill is due, or any other amount, from respondents.
They then claim that McAuley, the trustee, had loaned out the money soon after he received it, on interest, and took notes for it; and that in 1863 or 1864, he collected the notes in Tennessee money, which was current at the time. That after this he had no opportunity to re-loan it safely, except about five or six hundred dollars, and had the residue on hand at his death, and they found the money and notes on hand, when they were appointed administrators, separate from the balance of *436 the money and papers of the trustee, and labelled as the fund of the trust estate.
They then claim that "Winfrey was appointed trustee, at request of complainant, by her attorney, and insist on the conclusiveness of the settlement made with him, as made under the order of the Court.
As far as we, can see in the record, there is nothing to show that Mrs. Barker had anything to do with .the appointment of Winfrey, -trustee, nor in procuring the order of the court, directing him to take into possession the funds reported as in the hands of the administrators of W. M. McAuley. There was no case pending in the Chancery Court to which she was a party. The case is entitled, as we have seen, W. M. McAuley, Trustee for Sarah Mayfield, but does not assume that Mrs. Mayfield, nor Mrs. Barker, was in any way party to the decree, and we suspect, from the fact that the recitals found in said decree correspond precisely with the report made by the administrators only a few days afterwards, and the promptness with which they make said report, before the newly appointed trustee, Winfrey, had given his bond, that they were the parties who managed to have this strange decree entered on the records of the Court at Camden.
We may dispose of this decree, and the defense resting on it, - by saying that the whole proceeding is absolutely void and of no effect whatever in this case.
*437 There was. no suit in said court — the court had no jurisdiction of the party who was interested in the question — Mrs. Barker — nor does the decree on its face assume that she was party to the proceedings in any way.
"We come now to the question of the rights of the parties, on the bill, answer and proof.
The fund was settled by the decree of the Chancery Court, appointing McAuley trustee, to the sole and separate use of' Mrs. Barker and her children, and the trustee whs directed “to pay of the said fund to the said Sarah, as he may think her necessities may require.”
The proof shows that McAuley had loaned the trust fund to one Samuel Crockett, a brother of Mrs. Barker, and had taken, his note, with Barker as security. Crockett gave in payment of this note, notes on other parties, one on MeCane — Me-Cane paid his note to McAuley, probably in 1863, in Tennessee money. There is some little uncertainty as to whether it was the Bank of Tennessee money, or the Union and Planters’ Bank. However, MeCane who made the -payment says, that his impression is, that it was Union and Planters’ Bank notes, or the most of it, though he says, there was no difference in value of Tennessee money at the time — it was all current.
Crockett, however, says, that he told McAuley not to receive the payment from MeCane in Tennessee money — that he could buy as much as he wanted in Nashville at from fifty to fifty-five cents *438 on tbe dollar — from which we infer, that it was passing current in the ordinary transactions of the country, but was depreciated in the cities and monetary centers, as compared with other currency— whether greenbacks or gold, this proof does not show.
We see no evidence of bad faith on the part of McAuley, in the receipt of the money. It was passing current at the time in his locality. He seems to have acted with the amount of prudence that men exercise in the management of their own affairs. He, under the circumstances, was only bound for ordinary prudence, and the exercise of a reasonable discretion, in the management of this fund, and bound to perfect good faith. A trustee cannot, as we have several times held, be made responsible, where he receives in good faith, the currency issued by and under the authority of the State, in that period of disturbance when all the currency of the country was of doubtful value, and depended on the uncertain result of a great civil strife, as to whether it would be good or worthless.
It was his duty, however, to loan this fund on good security, or to show a good reason for his failure so to do.
The defendants in their answer, claim that this could not have been done. This being matter of discharge set up by them, they are bound to prove the fact thus alleged. This they have failed to do. They must be held then to account for the fund thus received, but as it was received in a currency *439 that the proof shows was probably depreciated, as compared with United States Treasury notes, they must account for it at its value when received, as compared with such notes, with interest from the time received, in 1863.
The defendants will be allowed a credit for the notes handed over to "Winfrey, for the use of Mrs. Barker — as the loan seems to have been a proper one —made at any rate in good faith — and if the amount received from the sale of the Tennessee money handed over by defendants to Winfrey, has been received by, or appropriated to the use of Mrs. Barker, they will be entitled to a credit for that sum.
The defendants will also be entitled to show 'the value of the services of McAuley, as trustee, in managing the fund from the time of his appointment up to the time of receipt of this money, and will have that allowed them as a credit.
The Chancellor’s decree will be modified, as indicated in this opinion, ancl the case remanded to Chancery Court at Camden for proper accounts.
Defendants will pay the costs of court below, and they and their sureties for appeal will pay half the costs of this court, and complainants the other half.